**Sandy K. DAVIS, Respondent,**

v.

**MISSOURI DIVISION OF FAMILY SERVICES, Appellant.**

**No. WD 50336.**

Missouri Court of Appeals,
Western District.

Sept. 26, 1995.

Nancy J. Melton, Mo. Div. of Family Services, Independence, for appellant.

Donald Terry Norris, Kansas City, for respondent.

Before HANNA, P.J., and BRECKENRIDGE and SMART, JJ.

HANNA, Presiding Judge.

On April 28, 1993, the Missouri Division of Family Services Child Abuse and Neglect Registry received a report that S.F., a twenty-two month old female child, had been physically abused. The report was made after S.F. was hospitalized for an apparent seizure suffered at the home of her babysitter, Sandy Davis. Doctors determined that the seizure was caused by a subdural hematoma S.F. sustained. The Division of Family Services (Division) conducted an investigation pursuant to §§ 210.110–210.165 RSMo 1994 and determined there was reason to suspect that S.F. had been physically abused by Ms. Davis. The Division sent a letter to Ms. Davis notifying her of its determination. When a determination of probable cause to suspect child abuse is made, a report of such is filed with the division and, subject to rules of confidentiality, is made available to various agencies and others enumerated in § 210.150 RSMo Supp.1993. It is this determination that is the subject of this appeal. Ms. Davis filed a petition for judicial review with the Circuit Court of Clay County pursuant to § 210.152.3. A hearing was held and on October 19, 1994, the circuit court entered an order setting aside the Division's determination, finding it was not supported by competent and substantial evidence. The subject of the appeal to the circuit court and to this court is the division's determination and recordation of probable cause to suspect child abuse.[1]

■ On appeal, the Division contends the court erred in setting aside the Division's determination that there was reason to suspect that Ms. Davis had physically abused S.F. The Division claims the trial court's findings and judgment were not supported by substantial evidence and were against the weight of the evidence. The judgment of the trial court will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or misapplies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ In its "Memorandum of Findings," the court found that the evidence did not raise a reasonable inference that Ms. Davis had injured the child, and that the greater weight of the evidence favored a finding that Ms. Davis had not abused the child. The court further found that the "evidence comes closer to raising an inference that the child was injured at her own home than at the home of petitioner." Appellate courts do not weigh the evidence, determine the credibility of witnesses, or resolve facts. *Brown v. Van Noy*, 879 S.W.2d 667, 671 (Mo.App.1994). Rather, appellate courts determine on appeal whether the record contains sufficient evidence to support the verdict. *Id.* Here, the question is whether the division's determination that "there is reason to suspect abuse ... exists" is supported by competent and substantial evidence and is not against the weight of such evidence. § 210.152.3(3) RSMo Supp.1993.[2] The transcript of the hearing before the circuit court supports the division's determination of probable cause to suspect child abuse.

■ The undisputed facts show that on April 28, 1993, S.F. arrived at Ms. Davis' home between 11:00 a.m. and noon. According to Ms. Davis' testimony, S.F. had a nickel to quarter-sized, yellowish colored bump near the hairline of her forehead when she arrived that morning. Ms. Davis also testi-

1. The statute which provides for review by the circuit court, § 210.152.3 RSMo Supp.1993, limits the right to appeal by the "alleged perpetrator" but does not address the division's right of appeal. This issue was not raised on appeal. Our sua sponte inquiry holds that the division has a right to file an appeal pursuant to § 512.020 RSMo 1994.

2. Repealed in 1994. The present statutory provision is § 210.152.3 and .4. The first appeal is an administrative review by the child abuse and neglect review board established by § 210.153 RSMo 1994.

fied that S.F. appeared tired, had a decreased appetite, and had diarrhea throughout the day. Ms. Davis testified that at approximately 2:30 p.m., she observed S.F. biting the leg of her three-year-old daughter. Ms. Davis further testified that she grabbed S.F. by the jaw and slapped her on the cheek to try to make her release her daughter's leg. She then stuck her finger in S.F.'s mouth and pried it open. Ms. Davis testified that between 7:00 p.m. and 7:30 p.m., S.F. was sleeping next to her on the couch when suddenly she sat up, rolled her eyes back, clenched her mouth shut, and fell back unconscious on the couch. Ms. Davis stated that she rolled S.F. over to make sure she was not choking on her tongue and checked her breathing and pulse. She then called her doctor at home and notified S.F.'s mother at work, who had a friend pick up S.F. at Ms. Davis' home. According to Ms. Davis, S.F. was still unconscious when the mother's friend arrived twenty to twenty-five minutes later. S.F. was taken to the emergency room of Children's Mercy Hospital.

The expert medical testimony was presented by two physicians who had examined S.F. at the hospital. Dr. Kiersten Reilly, the first doctor to examine S.F. on April 28, 1993, testified that when S.F. arrived in the emergency room, she was limp, unresponsive, and in serious condition. Dr. Reilly further testified that S.F. had a large, reddish and blue bruise on her forehead that had some swelling, as well as an abrasion on her nose and multiple small bruises on her cheeks. Dr. Reilly indicated that yellow bruises are older bruises, generally more than a week old, and would not evolve into the type of bruise found on S.F.'s forehead when she entered the hospital. Dr. Reilly testified that S.F. had sustained a subdural hematoma, which is a type of intercranial hemorrhage, or bleeding on the inside of her skull, which caused a swelling of the brain and changes in S.F.'s level of consciousness. It was Dr. Reilly's opinion that S.F.'s head injury had been caused by a "very forceful blow," because the large bruise located directly over the hemorrhaged area appeared fresh. Dr. Reilly also testified that she believed S.F. had sustained the subdural hematoma within 24 hours of

her arrival at the hospital, and most likely within an hour or two of the seizure.

It was also Dr. Reilly's opinion that if S.F. had been suffering symptoms of a subdural hematoma at 2:30 p.m., she would not have been well enough neurologically to have engaged in an altercation with another child, as described by Ms. Davis. In light of the testimony concerning the altercation, Dr. Reilly stated, "I don't think it's possible that she sustained that injury prior to 2:30 in the afternoon."

Dr. Kurt Davey, a medical doctor specializing in pediatric emergency care, testified that he first treated S.F. on April 29, 1993, and became her primary physician while she was in the hospital. Upon examining S.F., Dr. Davey found multiple bruises, a subdural hematoma, and a healing rib fracture. The bruises included a black bruise measuring 6 centimeters by 6 centimeters on the forehead, which was slightly yellow at the periphery, a black and purple bruise on the left submandibular area underneath the jaw, a black swollen bruise at the left angle of the jaw, and a bruise and abrasion on the lower spine. Dr. Davey further testified that the black discoloration of the bruises on S.F.'s forehead and the black, purple, and blue discoloration of the bruises on her chin indicated these bruises were one to four days old. Dr. Davey testified that the subdural hematoma was located inside the right frontal area of the skull. When questioned about the cause of the subdural hematoma, Dr. Davey testified that without a history of significant trauma, such as a motor vehicle accident or a fall from an extreme height, "it is pathonomatic of subdural hemorrhage in a child of child abuse." It was his opinion that a subdural hemorrhage may occur if the child is shaken and incurs an impact injury associated with the shaking.

Concerning when S.F.'s head injury may have occurred, Dr. Davey testified that the injury would have normally occurred immediately prior to or within several hours, probably two to three, of the seizure. Dr. Davey testified that the symptoms of a subdural hemorrhage usually progress rapidly, and "[i]f a child is going to have symptoms, they'll have them immediately." He further

testified that a child who is progressing to a seizure state will exhibit more serious symptoms. He also indicated that he did not believe it was possible that S.F. could have suffered a blow to the head prior to noon, exhibit symptoms all day, and then suffer a seizure at 7:00 p.m. It was his opinion that if S.F. was having symptoms at 2:30 p.m., she would have had the seizure much earlier than 7:00 p.m. Dr. Davey also testified that he did not believe that S.F. could have had a subdural hematoma at 2:30 p.m. and still been able to function well enough to fight with another child. It was Dr. Davey's opinion that the injury causing S.F.'s subdural hemorrhage occurred shortly before her seizure.

In addition to the medical testimony, Glenda Sandlin, a family friend of S.F.'s, testified that she visited S.F. on the evening of April 27, 1993, and that S.F. was acting, talking, and moving about in a normal manner. Ms. Sandlin did not observe bruises on S.F.'s forehead that evening. She also identified photographs that she had taken of S.F. on that same evening which showed no bruises on S.F.'s forehead.

Ms. Davis denied causing the bruise on S.F.'s forehead. However, she admitted that she may have caused some of the other bruises on S.F.'s face, when she used physical force to get S.F. to stop biting her daughter's leg.

The medical evidence reflects that S.F. has been the victim of physical abuse. There was no evidence to show that the subdural hematoma suffered by S.F. resulted from an accidental event. Medical expert testimony indicated the subdural hematoma was caused by a "very forceful blow" to the head or by a shaking and an accompanying impact injury. In any event, both medical experts testified that the injury causing the subdural hematoma most likely occurred within a few hours of the seizure. In view of the testimony that S.F. had engaged in an altercation with another child around 2:30 p.m., the medical experts believed that the injury probably occurred between 2:30 p.m. and 7:00 p.m. Both doctors observed a large fresh bruise located directly over the hemorrhaged area of S.F.'s skull when she was admitted into the hospital, which was not present when S.F. arrived at Ms. Davis' home on April 28, 1993. S.F. was in the exclusive care and control of Ms. Davis from the time she arrived at Ms. Davis' home until she was taken to the hospital around 7:30 p.m. There was no substantial evidence presented at the hearing, which demonstrated that the subdural hematoma was caused by an injury occurring in S.F.'s own home. All of the evidence leads to the unmistakable conclusion that the injury which caused the subdural hematoma probably occurred while S.F. was in the exclusive care and control of Ms. Davis. Accordingly, we conclude that the division's determination that there was reason to suspect child abuse existed was supported by competent and substantial evidence and was not against the weight of such evidence. § 210.152.3(3). Therefore the trial court's judgment was not supported by substantial evidence and was against the weight of the evidence. *Murphy v. Carron,* 536 S.W.2d at 32.

The judgment is reversed and the cause remanded with directions for the trial court to enter an order reinstating the Division's determination.

All concur.